# In the United States Court of Federal Claims

No. 22-62L

(Filed:  July 7, 2026)

|  |  |
|---|---|
| **CHARLES J. PENLAND, et al.,** | ) ) ) |
| *Plaintiffs,* | ) ) ) |
| **v.** | ) ) |
| **THE UNITED STATES,** | ) ) |
| *Defendant.* | ) ) ) |

*Mark F. Hearne, II*, True North Law, LLC, St. Louis, Missouri, for Plaintiffs.

*Arthur D. Burger*, Jackson & Campbell, P.C., Washington, D.C., for Mark F. Hearne, II.

*Joseph H. Kim,* Natural Resources Section, Energy and Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs was *Adam R.F. Gustafson*, Acting Assistant Attorney General, Energy and Natural Resources Division.

## OPINION AND ORDER

*SOLOMSON*, **Chief Judge.**

A well-known proverb warns those who live in a glass house not to throw stones.[1] What Plaintiffs did here is worse than that.  The proverb assumes a rough parity — two flawed parties, each exposed, the hypocrite merely imprudent for hurling what could be hurled back.  That is not what happened here.  Plaintiffs did not throw stones from a glass house at another glass house.  They stood inside a house made entirely of glass, pointed

---

[1] George Herbert, *Jacula Prudentum* (1640), *reprinted in* The English Poems of George Herbert: Together with His Collection of Proverbs Entitled Jacula Prudentum 227 (Longmans, Green & Co. 1891) ("Whose house is of glass must not throw stones at another."), *available at* https://perma.cc/Q89R-N9BM.

at the brick house across the street, and declared *that* structure the fragile one. They accused the government's legal position of being "meritless and frivolous" and "stupid and frivolous," and asserted that "[n]o authority would hold" the railroad deeds at issue conveyed property in fee simple rather than a mere easement — the issue on which this Trails Act takings case rises or falls. Each charge, however, was not merely overstated, but rather exactly backwards. Plaintiffs' briefs failed to cite a single North Carolina case that supports the sweeping propositions of state law on which their case depends, while the controlling decision of the North Carolina Supreme Court, *McCotter v. Barnes*, 101 S.E.2d 330 (N.C. 1958), holds the opposite and favors the government. Moreover, authority Plaintiffs assured this Court did not exist — a decision holding that materially identical deeds conveyed property in fee simple — not only exists but had been served on Plaintiffs' counsel more than a month before he denied it. That's a long way of saying that this Court does not write here to criticize a lawyer for throwing stones. It writes because the lawyer who cried "frivolous" was himself the one without a case.

Accordingly, and for the reasons explained below, this Court not only grants the government's motion for summary judgment, but also finds that Rule 11 sanctions against Plaintiffs' counsel are more than warranted — they are necessary to enforce a standard to which this Court expects attorneys to adhere.

I.      SUMMARY JUDGMENT

A.      Factual and Procedural Background

Plaintiffs are a group of landowners who claim to own thirteen parcels of land situated adjacent to and underlying a 19.1-mile section of a former railroad corridor in Henderson and Transylvania Counties, North Carolina. *See generally* ECF No. 10 ("Am. Compl."). In the 1890s, the Hendersonville and Brevard Railway, Telegraph, and Telephone Company ("HBR" or "original railroad") acquired a property interest in the corridor via a series of deeds (the "source deeds") from private landowners, the predecessors-in-title to the Plaintiffs. ECF No. 61 at 10 ("Pls. Cross-MSJ"); *see also* ECF No. 51 ("Def. MSJ") at Exs. 3-12. A list of each Plaintiff and the corresponding source deeds follows:

| Plaintiff | Source Deed | Exhibit. No. (ECF No. 51) |
|---|---|---|
| Charles J. and Carolyn B. Penland | Garrett | Ex. 3 |

2

| | | |
|---|---|---|
| Daniel P. Brown | Toms | Ex. 4 |
| Ernest C., Jr. and Pamela D. Cloer | Toms | Ex. 4 |
| Gary M. Delise and Thomas G. Delise | Allison | Ex. 5 |
| Les A. Foss and Jennifer E. Foss, Trustees, or their successors in interest, of The Les and Jennifer Foss Living Trust dated December 2, 2021 and any amendments thereto | Henry | Ex. 6 |
| Joen Goodman and William Goodman | Price | Ex. 7 |
| David and Marie Levine | Ripley | Ex. 8 |
| Vincent Palumbo, Jr. | Allison | Ex. 5 |
| Diane M. Scott | Ripley | Ex. 8 |
| Catherine L. Stone, Trustee, under the Catherine L. Stone Trust dated (UDT) August 9, 2011, for the benefit of (FBO) the Stone family | Whitted | Ex. 9 |
| | McMinn | Ex. 10 |
| Cesar R. and Isabel Valdez | Clayton | Ex. 11 |
| Janet Walczak | Ledbetter | Ex. 12 |

All the source deeds contain nearly identical conveyance language:

> [I]n consideration of the benefits to be by us derived from the construction of its railroad through their premises in said State and County particularly described as follows . . . and of one dollar to them in hand paid, . . . [the grantors] give grant bargain sell and convey to the Hendersonville and Brevard Railway Telegraph and Telephone Company and its successors forever a strip of land of sufficient width upon which to locate construct operate and maintain a standard gauge railroad through said premises as has been marked out by the engineer or engineers of said company and indicated upon the map by him or them and the president of said company placed on file in the office of the clerk of said Henderson County as required by law such a strip as marked out and indicated to be the land hereby conveyed provided that this deed shall be void unless said company shall have

3

> constructed a railway through said premises on or before [a certain date]. Provided [other condition(s)].

Def. MSJ at Ex. 5 (Allison deed with partial transcription); *see also* Pls. Cross-MSJ at 23 (quoting the Wilson deed and asserting that "[a]ll of the other conveyance documents are similar"); ECF No. 68, Oral Argument Transcript ("Tr.") 15:20-16:3 (Plaintiffs' counsel agreeing that the source deeds are "in material respects fairly identical").[2]

In 2021, Blue Ridge Southern Railroad ("Blue Ridge"), the original railroad's successor-in-interest, filed a Verified Notice of Exemption pursuant to 49 C.F.R. § 1152.50 with the Surface Transportation Board ("STB"), seeking authorization to abandon the corridor "to facilitate interim use of the Line as a public recreation trail, consistent with 16 U.S.C. § 1247(d)[,]" the National Trails System Act or "Trails Act." Am. Compl., Ex. 1 at 5. On April 27, 2021, the STB determined that the abandonment exemption would be effective on May 27, 2021, unless stayed for reasons such as a request for interim trail use/rail banking pursuant to 49 C.F.R. § 1152.29. Def. MSJ at 6. The STB gave Blue Ridge one year to exercise the authority granted and fully abandon the line by filing a notice of consummation. *Id.*

Instead of abandoning the rail line, on June 16, 2021, Blue Ridge and Ecusta Rails2Trails LLC ("Ecusta") filed a joint Petition for Interim Trail Use and Notification of Trails Use/Railbanking Agreement, notifying the STB that the parties had already entered into an interim trail use agreement and asking the STB to issue a Notice of Interim Trail Use or Abandonment ("NITU"). Am. Compl., Ex. 2 at 2. On June 29, 2021, the STB issued the NITU. *Id.*, Ex. 3 at 11. That same day, the parties filed a notification of the trail use agreement. Def. MSJ at 7 (citing *Blue Ridge Southern Railroad, L.L.C. — Abandonment Exemption — In Henderson and Transylvania Counties, N.C.*, No. AB 1306X (STB June 29, 2021), Doc. ID 302640).

On January 19, 2022, Plaintiffs filed a complaint in this Court, alleging that, as owners of the property abutting and underlying the railroad corridor, they suffered a Fifth Amendment taking of their real property interests, without compensation, on the day the NITU was issued. *See* ECF No. 1 ("Compl."); Am. Compl. at 2. On June 17, 2025, following the close of discovery, the government filed a motion for summary judgment,

---

[2] Although Plaintiffs rely on the Wilson conveyance in their opening brief, the deed is not part of any of the pertinent chains of title and is thus merely illustrative of the language used in the other source deeds.

arguing that the source deeds conveyed a fee simple ownership interest in the railroad corridor to the original railroad, which was then transferred to Ecusta via Blue Ridge, the original railroad's successor-in-interest. Def. MSJ at 1-2 ("The pertinent title documents are deeds by which the original railroad obtained a fee simple interest in the corridor."). The government contends that because the original railroad acquired a fee simple interest in the subject properties, Plaintiffs have not, and cannot, establish an ownership interest in the corridor and, therefore, are not entitled to compensation. *Id.*

On August 5, 2025, Plaintiffs filed their response and cross-motion for summary judgment, construing the original railroad's interest in the railroad corridor as a "right-of-way across [Plaintiffs'] land." Pls. Cross-MSJ at 8. They argue that "when the railroad abandoned the railway line, [Plaintiffs] held unencumbered title to the fee estate in the land," which was taken without just compensation by the issuance of the NITU. *Id.* at 9.

On September 4, 2025, the government filed its response and reply. ECF No. 62 ("Def. Reply"). On September 18, 2025, Plaintiffs filed their reply. ECF No. 63 ("Pls. Reply"). On January 12, 2026, this Court held oral argument on the parties' pending motions, ECF No. 68, following which this Court issued a show cause order to Plaintiffs' counsel, pursuant to Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC"), to explain why sanctions should not be imposed for his unsupported — and unsupportable — arguments, ECF No. 69. Plaintiffs' counsel filed his response to that order on February 11, 2026. ECF No. 71.

## B.    Standard of Review

RCFC 56(a) provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).[3] A fact is material if it might "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and an issue is genuine if it "may reasonably be resolved in favor of either party," *id.* at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

---

[3] RCFC 56(a) is the same as Federal Rule of Civil Procedure 56(a).

When, as here, the parties have cross-moved for summary judgment, "the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration." *Silver State Land LLC v. United States*, 155 Fed. Cl. 209, 212 (2021) (quoting *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003)); *see also Lippmann v. United States*, 127 Fed. Cl. 238, 244 (2016) ("The [RCFC 56] standard also applies when the Court considers cross-motions for summary judgment.").

In this case, the material facts are not in dispute. Accordingly, the central issue before the Court — whether the source deeds conveyed a fee simple interest in the railroad corridor, or merely an easement — is a purely legal one, thus making this issue particularly amenable for summary judgment.

**C.      Discussion: This Court Grants the Government's Motion for Summary Judgment**

The government's implementation of the Trails Act is subject to the Fifth Amendment's Takings Clause. "It is settled law that a Fifth Amendment taking occurs in Rails–to–Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010) (citing *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009)). If the railroad owns the underlying property in fee simple at the time of the alleged taking, however, "another party cannot be owed just compensation for the taking of that land." *Whispell Foreign Cars, Inc. v. United States*, 97 Fed. Cl. 324, 330 (2011). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001); *see also Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1364 (Fed. Cir. 2009) ("[I]n order to have a cause of action for a Fifth Amendment taking, the plaintiff must point to a protectable property interest that is asserted to be the subject of the taking.").

When evaluating a rails-to-trails takings claim, this Court evaluates three factors:

> (1) who owned the strips of land involved, specifically did the
> Railroad ... acquire only easements, or did it obtain fee simple
> estates;

>(2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and
>
>(3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc).  In this case, the first question — whether the railroad acquired an easement or fee simple title — is dispositive.  If the railroad acquired a fee simple interest in the property, "the court need not address the two remaining questions because the Plaintiffs did not hold any reversionary interest in the property that was taken."  *Kent v. United States*, 174 Fed. Cl. 684, 689 (2025).

State law governs the "property rights of the parties in a rails-to-trails case." *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020); *see also Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015) ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state law." (citing *Preseault*, 100 F.3d at 1543)). Because the property in this case is in North Carolina, this Court applies North Carolina law.  Plaintiffs have the burden to demonstrate that they own the land at issue.  *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken[.]"); *BHL Props., LLC v. United States*, 135 Fed. Cl. 222, 229 (2017) ("[I]t is [plaintiffs'] burden to prove [their] ownership of the land abutting the railway corridor; it is not the government's burden to disprove it.").

### 1.    Plaintiffs waived their *McCotter*-related arguments.

The government builds its summary judgment argument around the North Carolina Supreme Court's decision in *McCotter v. Barnes*, 101 S.E.2d 330 (N.C. 1958), which relied, in part, on a North Carolina statute to find that a deed granted land to a railroad in fee simple.  Def. MSJ at 12-13 (citing *McCotter*, 101 S.E.2d at 334).  The relevant statute, now codified as N.C. Gen. Stat. § 39-1, creates a presumption of fee simple conveyance for grants of real estate:

Chapter 39. Conveyances.

Article 1. Construction and Sufficiency

§ 39-1. Fee presumed, though word "heirs" omitted.
When real estate is conveyed to any person, the same shall be held and construed to be a conveyance in fee, whether the word "heir" is used or not, unless such conveyance in plain and express words shows, or it is plainly intended by the conveyance or some part thereof, that the grantor meant to convey an estate of less dignity. (1879, c. 148; Code, s. 1280; Rev., s. 946; C.S., s. 991.)

N.C. Gen. Stat. § 39-1 (2024); *see also* Def. MSJ at Ex. 13 (N.C. Sess. Laws, ch. 148 (1879), the predecessor statute to N.C. Gen. Stat. § 39-1).[4]  The government contends that like the deed in *McCotter*, "the source deeds [in this case] are clearly conveyances of real estate, as each one states that the grantors grant bargain and sell 'a strip of *land*' and refer to '*the land* hereby conveyed[,]'" and thus "establish the original railroad's fee simple interest in the disputed land."  Def. MSJ at 11 (quoting Allison deed (Def. MSJ at Ex. 5)).

The government also highlights numerous similarities between the *McCotter* deed and the railroad's source deeds.  Like the conveyances at issue here, the *McCotter* deed included:

(1) a consideration of a small amount of "Two (2.00) Dollars," (2) the granting clause's conveyance of land ("a tract or parcel of land"), (3) the land's precise boundaries to be determined by future action ("to be cut" out of the described tract of

---

[4] N.C. Sess. Laws, ch. 148 (1879) provided:

Chapter 148. AN ACT TO PROVIDE THAT ALL CONVEYANCES OF REAL ESTATE SHALL BE CONSTRUED TO BE IN FEE, UNLESS THE CONTRARY SHALL APPEAR FROM THE LANGUAGE OF THE INSTRUMENT.

The General Assembly of North Carolina do enact:

Section 1. When real estate shall be conveyed to any person the same shall be held and construed to be a conveyance in fee, whether the word "heirs" shall be used or not, unless such conveyance shall, in plain and express words show, or it shall be plainly intended by the conveyance or some part thereof, that the grantor meant to convey an estate of less dignity.

land"; "[t]o be located" by the grantee after execution of the deed), (4) identifying the intended railroad use ("There shall be no building other than for railroad use."), and (5) a time limit for building the railroad (otherwise "the estate hereby conveyed is to cease and determine and the property hereby conveyed is to revert to and become the property of the grantors herein").

Def. MSJ at 13 (quoting *McCotter*, 101 S.E.2d at 332). All of these features, the government points out, did not deter the *McCotter* court from finding a conveyance of "an unqualified fee-simple estate," *McCotter*, 101 S.E.2d at 334, and should not prevent this Court from finding so here. Def. MSJ at 13.

Plaintiffs improperly waited until their reply brief to grapple with the government's *McCotter*-centered argument. *See* Pls. Reply at 13-14. Indeed, *McCotter* is not so much as mentioned a single time in their 29-page response and cross-motion. Instead, Plaintiffs devote the vast majority of that brief to an explication of supposed "background principle[s] of law that inform[] the interpretation of these conveyances." *See* Pls. Cross-MSJ at 16-19 (grantor's intent); *id.* at 20-22 (the strip and gore doctrine); *id.* at 24-25 (railroads and eminent domain). Their brief analysis of N.C. Gen. Stat. § 39-1 is relegated to a single page at the very end of their argument, where they characterize the government's position as "meritless and frivolous" and posit an alternative reading of the statute — sans supporting North Carolina caselaw — that this Court struggles to even understand. Pls. Cross-MSJ at 32.[5]

This Court has previously held that "[a] party's failure to raise an argument in an opening or responsive brief constitutes waiver." *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58–59 (2021) (finding that a response brief's "single reference" to prior arguments indicated that plaintiff "all but abandoned" his claim); *see also Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695 (2022) (finding that Plaintiff "waived those eight claims" for which it "failed to respond to the government's counterarguments"); *Cap Export, LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018) (quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D. Cal. 2011), for

---

[5] Plaintiffs contend that the "statute applies to the construction of estates in land," but does not apply to servitudes, such as easements. Tr. 17:7-15. But the statute provides a presumption regarding how to interpret a conveyance of real estate in the first place (*i.e.*, in favor of a fee simple transfer), as discussed *infra*.

the proposition that "in most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue").

Reserving an argument for a reply brief will not preserve it because "[i]t is unfair to consider an argument to which the government has been given no opportunity to respond." *United States v. Ford Motor Co.*, 463 F.3d 1267, 1277 (Fed. Cir. 2006); *see also Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of [the Federal Circuit], arguments not presented in a party's principal brief to the court are typically deemed to have been waived"); *Advanced Powder Sols., Inc. v. United States*, 160 Fed. Cl. 575, 581 n.8 (2022) ("[A] reply brief is an entirely inappropriate medium for new arguments."). Plaintiffs' failure to address *McCotter* in their opening brief thus ties this Court's hands; "[a]s a matter of litigation fairness and procedure," we cannot entertain their belated attempts to distinguish *McCotter* from this case. *Novosteel SA*, 284 F.3d at 1274.

In the alternative, as explained below, this Court finds that the government's reading of the deeds at issue, in light of North Carolina law, is correct — and, on this record at least, it's not a close call.

> **2.   The government is entitled to summary judgment because Plaintiffs do not demonstrate any disputed material fact and fail to overcome the statutory presumption of a fee simple conveyance.**

Let us be clear about what Plaintiffs do argue and what they do not. Plaintiffs' entire opposition to the government's summary judgment motion is purely legal; they assert that the deeds transferred only an easement, not land in fee simple. Plaintiffs raise no factual dispute about: (1) the acreage or physical boundaries of the railroad's occupation; (2) whether the railroad exceeded any deed description; (3) the identity of any owners or successors; or (4) the language of the conveyances themselves (both sides agree on what the deeds say). Rather, Plaintiffs' opposition to the government's motion for summary judgment reduces to this legal argument: "[i]t could not be more explicit and emphatic that [the] predecessors-in-title intended to grant only a right-of-way for a railroad line across their land," Pls. Cross-MSJ at 23, and that "[w]hen the railroad line

10

was no longer necessary and was abandoned, the right-of-way easement terminated," *id.* at 18.  Plaintiffs fail, however, to offer a single phrase in the source deeds sufficient to overcome North Carolina's statutory presumption of a fee simple conveyance.

As the government correctly asserts, North Carolina law presumes that conveyances of real estate are in fee simple, absent conflicting provisions in the granting instrument.  N.C. Gen. Stat. § 39-1; *McCotter*, 101 S.E.2d at 334.  In *Bevirt v. United States*, a recent decision from our Court involving some of the same source deeds at issue here, Judge Hadji explained that because the source deeds "all include the hallmarks of a fee simple conveyance," the Court must "begin[] its analysis with the underlying presumption the grant was a fee simple conveyance." *Bevirt v. United States*, 177 Fed. Cl. 275, 282 (2025) (citing *McCotter*, 101 S.E.2d at 334, and noting that the source deeds "explicitly convey 'a strip of land' and reference elsewhere 'the land hereby conveyed'"), *recons. denied*, 180 Fed. Cl. 217 (2026).

So too, here.  The source deeds at issue in this case "give[,] grant[,] bargain[,] sell[,] and convey . . . a strip of land" and refer to "the land hereby conveyed."  Def. MSJ at Exs. 3-12.  The undersigned agrees with Judge Hadji: "[s]uch language suggests an unequivocal grant of land, not an easement, and no conflicting provisions contradict this interpretation." *Bevirt*, 177 Fed. Cl. at 282.  The fact that the deeds recite only nominal consideration, and that the stated purpose of the conveyance was for the location and operation of a railway line, *see* Def. MSJ at Exs. 3-12, does not indicate a conveyance of a lesser property interest any more than the deed at issue in *McCotter*.  *See McCotter*, 101 S.E.2d at 332-35 (holding that the "deed conveyed title in fee simple" notwithstanding the deed's recital of only two dollars in consideration and the clauses either conditioning the conveyances on, or restricting them to, railroad purposes).  Like the North Carolina Supreme Court in *McCotter*, we see no reason to override the statutory presumption of a fee simple conveyance.  This Court thus adopts Judge Hadji's conclusion in full:

> [B]ecause Plaintiffs fail to provide any support to overcome the presumption of a fee simple conveyance, the Court finds as a matter of law that the Source Deeds granted HBR a fee simple conveyance, to which Plaintiffs retained no reversionary interest.  Having failed to establish a property interest in the land at issue, the Court further finds that Plaintiffs have not established the existence of an essential

> element to their case for which they bear the burden of proof at trial, and thus summary judgment is appropriate.

*Bevirt*, 177 Fed. Cl. at 283 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

In sum, Plaintiffs make many bold claims about North Carolina law, but fail to cite a single source of law that either undermines *McCotter*, in general, or its applicability to the deeds at issue in particular. *McCotter* all but dictates a win for the government, and Plaintiffs have provided nothing — persuasive or otherwise — to undermine that conclusion. Given that Plaintiffs raise no dispute of material fact and the law squarely favors the government, the government is entitled to summary judgment. Indeed, as discussed below, Plaintiffs' many unsupported assertions prompted this Court to issue a show cause order to their counsel to explain why sanctions should not be imposed upon him for substantial Rule 11 violations.

## II.   RULE 11 SANCTIONS

Shops selling fragile wares often post a warning to its browsing customers: *you break it, you bought it*. RCFC 11 carries a litigation analogue, as the Court put it to Plaintiffs' counsel at oral argument: "You file a brief, you sign it, you own it." Tr. 7:14-15. The occasion for that reminder was itself telling. Counsel's first response to being confronted with the contents of his own summary judgment brief was to disclaim the filing as "the wrong *corrected* brief" — to set the merchandise back on the shelf, as it were, and walk out of the store. Tr. 6:23 (emphasis added). But that is not a viable strategy for avoiding the consequences of violating Rule 11, which provides that, by signing a filing, an attorney certifies that "after an inquiry reasonable under the circumstances," its "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law." RCFC 11(b)(2).[6]

Much of the recent Rule 11 docket, in the federal courts generally, involves a new genre of misconduct: briefs drafted by generative artificial intelligence and filed by lawyers who, not understanding how large language models work, never noticed that the machine had invented the citations. That conduct is sanctionable, and courts have rightly sanctioned it. Repeatedly — to the point that it is surprising that counsel keep

---

[6] The Court notes that Plaintiffs' counsel never sought to file a second corrected brief or to provide proof to this Court that such a brief even exists somewhere.

making the same error.  *See, e.g., N.Z. v. Fenix Int'l Ltd.*, 2025 WL 3626155, at *2, *4-*5 (C.D. Cal. Dec. 12, 2025) (imposing a $3,000 sanction against the drafting attorney who "misused AI by failing to verify the validity of the AI-generated material" and a $10,000 sanction against the signing attorney and his firm, jointly and severally, where the firm "did not follow its standard practice of proofing and checking sections or contributions by other firms").[7]  But that Rule 11 failure, at bottom, is one of verification.  The offending lawyer at least believed that authority supported his or her position; the fault lies in trusting a tool he or she did not understand and skipping the check that would have exposed the error.

What occurred in this case is worse.  Plaintiffs' counsel, Mr. Mark F. ("Thor") Hearne, II, did not merely (unknowingly) rely on fictional authority.  He filed sweeping declarations about what North Carolina law *is* — in his own voice, over his own signature, and without citing a single North Carolina case that supports any of them.  For example, he wrote that "[u]nder North Carolina law the only interest the railroad could acquire was a right-of-way easement."  Pls. Cross-MSJ at 24.  He wrote that the contrary suggestion "is not only incredulous [sic], it is a frankly stupid and frivolous argument," because "[n]o authority would hold these documents conveyed the railroad title to the fee simple estate in the land." *Id.* at 23.  But the Supreme Court of North Carolina held precisely that, in *McCotter v. Barnes*, 101 S.E.2d 330 — a binding decision that Mr. Hearne's brief never cited, named, or distinguished.  And in *Bevirt v. United States*, 177 Fed. Cl. 275, Judge Hadji reached the same conclusion on materially similar instruments — a decision the government had placed on the docket in this case, by notice of supplemental authority, more than a month and "almost ten ECF filings" before counsel filed the brief. Tr. 7:17-23 (discussing ECF No. 52).

An assertion of settled law obliges a court to find the settled law.  Taking counsel at his word, this Court in preparing for oral argument went looking for the North Carolina authority his brief invoked, and the search came up empty — not because the Court missed something, but because there was nothing to find.  When the Court pressed

---

[7] *See also Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023) (imposing a $5,000 sanction on attorneys who "abandoned their responsibilities when they submitted non-existent judicial opinions with fake quotes and citations created by the artificial intelligence tool ChatGPT, then continued to stand by the fake opinions after judicial orders called their existence into question"); *Lifetime Well LLC v. IBSpot.com Inc.*, 819 F. Supp. 3d 373, 387 (E.D. Pa. 2026) ($4,000 sanction); *OTG New York, Inc. v. OTTOGI Am., Inc.*, 2025 WL 2671460, at *3 (D.N.J. Sept. 18, 2025) ($3,000 sanction); *Fletcher v. Experian Info. Sols., Inc.*, 168 F.4th 231, 233 (5th Cir. 2026) ($2,500 sanction); *Amarsingh v. Frontier Airlines, Inc.*, 2026 WL 352016, at *7 (10th Cir. Feb. 9, 2026) ($1,000 sanction).

the point at argument, Mr. Hearne could not identify a single North Carolina case supporting the assertions this Court flagged. *See* Tr. 10:23 ("I don't find it in there."); Tr. 11:8-9 ("I don't have that in front of me, Your Honor."); Tr. 12:23-24 ("I didn't cite a case under that specific heading."). He withdrew his North Carolina strip-and-gore argument. Tr. 11:10-23. He agreed that his accusation of frivolousness should be withdrawn. Tr. 7:24–8:2. And he conceded that the one authority he had assured the Court did not exist — a decision of this Court holding that materially identical deeds conveyed property in fee simple — in fact *did* exist, had been served on him months earlier, and made his "[n]o authority" representation "wrong." Tr. 6:5-18; 7:17-23.

Mr. Hearne's response, ECF No. 71, to this Court's order to show cause, ECF No. 69, now offers, for the first time, a few North Carolina decisions. Not one supports the proposition for which it is cited, and none undermines *McCotter*.

Dispatching a court on a wild goose chase — categorically, confidently, and with invective aimed at the party whose position the law in fact supports — is precisely what Rule 11's certification exists to prevent. A lawyer duped by AI misleads the court unknowingly; what this record reflects is the older variety of Rule 11 violations. Applying the objective standard that governs sanctions pursuant to RCFC 11, this Court concludes that Mr. Hearne violated RCFC 11(b)(2) and the duty of candor that the Rule reinforces.

### A.    Factual and Procedural Background

To recap, this is a rails-to-trails Fifth Amendment takings case. Plaintiffs, North Carolina landowners, contend that the United States took their property without compensation through operation of the National Trails System Act, when a railroad corridor crossing their land was converted to trail use. The parties' cross-motions for summary judgment, ECF Nos. 51 and 61, as explained *supra*, turn entirely on a single question of state property law: whether the railroad source deeds — substantially similar 1894-95 conveyances, of which the Allison and Wilson instruments are representative — conveyed to the railroad a fee simple estate in a strip of land, or only an easement. If a fee, the railroad's successor owned the corridor, and Plaintiffs have no compensable property interest. Two North Carolina authorities are dispositive of that question. The first is N.C. Gen. Stat. § 39-1, originally enacted in 1879, which directs that a conveyance of real estate "shall be held and construed to be a conveyance in fee" unless the instrument "in plain and express words shows, or it is plainly intended by the conveyance or some part thereof, that the grantor meant to convey an estate of less

14

dignity." The second is *McCotter*, in which the Supreme Court of North Carolina applied § 39-1 to a 1904 deed running to a railroad's predecessor and held that the deed conveyed "an unqualified fee-simple estate." 101 S.E.2d at 334. *McCotter* has never been overruled; the Supreme Court of North Carolina reaffirmed it in *Craig v. Southern Ry. Co.*, 138 S.E.2d 35, 36 (N.C. 1964) (per curiam), and the North Carolina Court of Appeals has applied and distinguished it since, *see Crawford v. Wilson*, 257 S.E.2d 696, 697 (N.C. Ct. App. 1979); *International Paper Co. v. Hufham*, 345 S.E.2d 231, 234 (N.C. Ct. App. 1986) (distinguishing *McCotter* where the deed conveyed no land and predated § 39-1). *McCotter* is binding North Carolina law.

The government's opening motion relied on N.C. Gen. Stat. § 39-1 and *McCotter*. Then, in late June 2025, the government also filed a notice of supplemental authority, ECF No. 52, highlighting Judge Hadji's then-recent decision in *Bevirt*, 177 Fed. Cl. 275, which applied *McCotter* to the construction of conveyance instruments, a few of which are at issue here, and concluded that they conveyed a fee simple interest, *id.* at 282-83. Plaintiffs filed their corrected opening brief on August 5, 2025. ECF No. 61. That brief does not cite *McCotter*. It does not cite *International Paper*, the decision on which Plaintiffs' easement theory now principally rests. It does not acknowledge Judge Hadji's decision. What it does instead is assert, boldly, that "[n]o authority would hold these documents conveyed the railroad title to the fee simple estate in the land," and that the government's contrary argument is "frankly stupid and frivolous." Pls. Cross-MSJ at 23.

Following oral argument, this Court ordered Mr. Hearne to show cause why he should not be sanctioned pursuant to RCFC 11 for four assertions regarding North Carolina law in his opening brief that appeared to this Court to "entirely lack supporting authority." ECF No. 69 at 1. Those assertions are:

1. "North Carolina public policy strongly disfavors the creation of fee estates in strips or 'gores' of land and presumes that strips of land are easements for a specific purpose." Pls. Cross-MSJ at 20.

2. "Under North Carolina law the only interest the railroad could acquire was a right-of-way easement." *Id.* at 24; *see also id.* at 30 n.12 ("North Carolina is not unique in its construction of railroad conveyances as granting only a right-of-way easement.").

3. "The government wrongly claims that North Carolina law mandates that any conveyance concerning an interest in real property must be presumed to convey title to the fee simple estate. Simply put[:] [t]he government's argument

15

is meritless and frivolous. These provisions of North Carolina law do not apply to servitudes such as easements. These provisions concern the construction of conveyances that apply to estates in land." *Id.* at 32 (emphasis and citation omitted).

4. "The other features of these conveyances [at issue], [including] the nominal consideration paid and the description by reference to an existing railroad line that had already been surveyed and located by the railroad, suggest that the grantor intended an easement." *Id.* at 33.

For each assertion, the order to show cause directed Mr. Hearne to indicate whether the brief cites North Carolina authority supporting it and, if not, to supply "the single best North Carolina legal authority" he could locate, together with the precise supporting language. ECF No. 69 at 4. The order further directed counsel to quote, in no more than five sentences and one case citation, the passage of a law review article counsel had invoked during oral argument to support his reading of N.C. Gen. Stat. § 39-1. *Id.* at 4-5. Mr. Hearne responded on February 11, 2026, joined by separate counsel, Arthur D. Burger, who addressed the question of the governing Rule 11 standard. ECF No. 71.

## B.    RCFC 11 Sanction Standards

By presenting a pleading, motion, or other paper to the Court — "whether by signing, filing, submitting, or later advocating it" — an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing's "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." RCFC 11(b)(2). The certification is measured objectively. Rule 11 "functions to assure that parties assert litigation positions that are objectively reasonable at the time of filing"; it "does not require a showing of bad faith" and "does not involve inquiry into a party's subjective good faith." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013). The Supreme Court has described Federal Rule of Civil Procedure 11 the same way. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) (Rule 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith"). The objective standard "is intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.[8]

---

[8] "[T]o the extent permitted by this court's jurisdiction, [the RCFC] must be consistent with the

16

This Court may enforce the Rule 11 certification on its own initiative, after ordering the attorney to show cause, RCFC 11(c)(3), and its determination is reviewed only for abuse of discretion. In *Oak Grove Technologies, LLC v. United States*, 116 F.4th 1364 (Fed. Cir. 2024), the Federal Circuit affirmed this Court's imposition of Rule 11 sanctions following a show cause order, holding that "[t]he Court of Federal Claims did not abuse its discretion in determining that the [sanctioned party's] conduct was not 'objectively reasonable' and, therefore, violated Court of Federal Claims Rule 11." *Id.* at 1385; *see id.* at 1383 (explaining that "[a] court abuses its discretion if the order imposing sanctions is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence" (quoting *1-10 Indus. Assocs., LLC v. United States*, 528 F.3d 859, 867 (Fed. Cir. 2008))).

Mr. Hearne, through Mr. Burger, urges the Court to require a finding of subjective bad faith before sanctioning conduct identified in a show cause order. ECF No. 71 at 6-10. The clear weight of Federal Circuit authority provides no support for that premise: a court's imposition of Rule 11 sanctions requires no evidence of bad faith, and a violation of that rule is neither established nor excused by the litigant's state of mind — objective unreasonableness is enough. *Kilopass*, 738 F.3d at 1313; *Oak Grove*, 116 F.4th at 1385 (affirming this Court's imposition of sanctions and finding that "[t]he Court of Federal Claims did not abuse its discretion in determining that the government's conduct was not 'objectively reasonable' and, therefore, violated [RCFC] 11"); *see Chambers*, 501 U.S. at 47. The proper question, then, is whether a reasonable attorney, after an inquiry reasonable under the circumstances, could have certified Mr. Hearne's contentions as warranted by North Carolina law.

In answering that question, this Court further notes that the Rule 11 certification does not operate in isolation. It reinforces — and is reinforced by — the lawyer's duty of candor to the tribunal, a duty this Court has had prior occasion to examine at length. *See Penna v. United States*, 153 Fed. Cl. 6, 36-42 (2021); *Hous. Auth. of City of Slidell v. United States*, 149 Fed. Cl. 692, 695 (2020); *Hanover Ins. Co. v. United States*, 146 Fed. Cl. 447, 450 (2019) (noting "the truism that attorneys must not mislead the court"). Rule 3.3 of the American Bar Association's Model Rules of Professional Conduct — captioned "Candor Toward the Tribunal" — provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or

---

Federal Rules of Civil Procedure [FRCP]." RCFC 83(a). "Interpretation of an FRCP 'informs the Court's analysis' of the corresponding RCFC." *Lakeland Partners, LLC v. United States*, 88 Fed. Cl. 124, 131 n.3 (2009) (quoting *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006)).

law previously made to the tribunal by the lawyer." Model Rules of Prof'l Conduct r. 3.3(a)(1); *see Penna*, 153 Fed. Cl. at 36-37. That Rule "sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process." Candor Toward the Tribunal, Ann. Mod. Rules Prof. Cond. § 3.3; *see* ECF No. 69 at 2 n.2 (quoting same). The duty is not professional etiquette; it is load-bearing. It "is an integral part of ensuring that our system of justice functions properly because first and foremost an attorney is an officer of the court, an institution whose purpose is to seek the truth in order to do justice," and it "helps promote judicial efficiency and avoid crowding the court's docket with frivolous actions." *Penna*, 153 Fed. Cl. at 41-42 (quoting *Bautista v. Star Cruises*, 696 F. Supp. 2d 1274, 1281 (S.D. Fla. 2010)). In short: "The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *Id.* at 42 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993)).

Zealous advocacy does not relax these obligations; it is bounded by them.[9] "[A] lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force," but "[p]erformance of that duty . . . is qualified by the advocate's duty of candor to the tribunal": although an advocate "is not required to present an impartial exposition of the law," he "must not allow the tribunal to be misled by false statements of law or fact." Ann. Mod. Rules Prof. Cond. § 3.3.

A lawyer is thus free to argue creatively about what a court should conclude from the governing materials — "all of which would constitute zealous advocacy." *Penna*, 153 Fed. Cl. at 41. "What a lawyer may not do, however, is decide on the conclusion he or she wants the Court to reach," and then shape the presentation — in *Penna*, of the facts; here, of the governing law — to produce it. *Id.* The Federal Circuit has confirmed that Rule 11 polices precisely this territory. In *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346 (Fed. Cir. 2003), our appellate court affirmed the formal reprimand of an attorney who cropped quotations from judicial opinions in a way that changed their meaning. Although "'the central purpose of Rule 11 is to deter baseless filings in district court,'" the court explained, "the scope of the rule is not that limited." *Id.* at 1355 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)). By signing a filing, an attorney

---

[9] *See United States Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 925 (4th Cir. 1995) ("[A] lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy."); *Martrano v. Quizno's Franchise Co.*, 2009 WL 1704469, at *3 n.11 (W.D. Pa. June 15, 2009) ("Counsel are cautioned that zealous advocacy must be tempered by observance of the duty of candor toward a tribunal.").

18

certifies that its legal contentions are "warranted by existing law" — and "[i]nherent in that representation" is that the attorney "stated therein the 'existing law' accurately and correctly." *Id.* at 1356. A "distortion of the law," the court held, is "inconsistent with and violate[s] the standards of Rule 11." *Id.* The court collected its precedents condemning, in the same vein, "distorting cited authority by omitting language from quotations," "misrepresenting facts or law to the court," and, of particular relevance here, "failing to reference or discuss controlling precedents." *Id.* (quoting *Abbs v. Principi*, 237 F.3d 1342, 1345 (Fed. Cir. 2001)); *see also Porter v. Farmers Supply Serv., Inc.*, 790 F.2d 882, 887 (Fed. Cir. 1986) (sanctioning a party that "distorted the quote by omitting language devastating to its position"). This aligns with other courts of appeals. *See Jorgenson v. Cnty. of Volusia*, 846 F.2d 1350, 1351-52 (11th Cir. 1988) (affirming sanctions against counsel for failing to identify relevant adverse precedent); *Borowski v. DePuy, a Div. of Boehringer Mannheim Co.*, 850 F.2d 297, 304–05 (7th Cir. 1988) (concluding that counsel's "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist[] [is] precisely the type of behavior that would justify imposing Rule 11 sanctions" (internal quotations omitted)).

Finally, the Federal Circuit has cautioned that because "[a] formal order of sanction of any kind imposed by a court necessarily tarnishes an attorney's professional reputation," sanctions should issue "only when truly warranted," *1-10 Indus. Assocs.*, 528 F.3d at 861, and that "being wrong in choice of theory" does not itself breach the Rule — there is a difference between "a position which is merely losing" and "one which is both losing and sanctionable," *id.* at 870. This Court is cognizant of that caveat. A losing argument is not sanctionable. But a categorical assertion of settled law, made without authority, contrary to controlling precedent, and deployed to brand the correct position frivolous, is a different thing entirely.

## C. Mr. Hearne Concedes the Assertions at Issue Had No North Carolina Support — Concessions this Court Had to Extract from Him

The order to show cause posed straightforward questions that required only short responses: for each assertion (quoted above), does the opening brief cite North Carolina authority, and, if so, where? ECF No. 69 at 4. Mr. Hearne's answers are concessions. As to Assertion 1 — the claim that North Carolina policy "strongly disfavors" fee estates in strips and "presumes" strips to be easements — Mr. Hearne "acknowledges that ECF No. 61 did not cite any North Carolina legal authority expressly supporting this assertion." ECF No. 71 at 10. Likewise, as to Assertion 3 — the claim that N.C. Gen. Stat.

§ 39-1 "do[es] not apply to servitudes such as easements" — Mr. Hearne now concedes that "ECF 61 does not cite a North Carolina case that expressly supports this proposition." *Id.* at 15.  As to Assertion 2 — the claim that "the only interest the railroad could acquire was a right-of-way easement" — the opening brief's sole North Carolina citation was *Beasley v. Aberdeen & Rockfish R. Co.*, 59 S.E. 60 (N.C. 1907), relegated to a footnote, ECF No. 61 at 28 n.10.  But Mr. Hearne acknowledged at argument that he "didn't cite a case [supporting] that specific heading," Tr. 12:23-24, and that the North Carolina cases he invoked from the podium appear nowhere in the briefs, Tr. 13:14-17, 15:8-12.  Finally, as discussed below, Assertion 4's reliance on nominal consideration runs headlong into *McCotter* itself.

Mr. Hearne's written concessions track what this Court extracted at argument, one assertion at a time.  Asked to locate North Carolina support for the strip-and-gore heading, counsel answered, "I don't find it in there," and ventured that the filing was "a draft."  Tr. 10:23-25.  Asked which North Carolina case he had meant to cite, he answered that he did not know.  Tr. 11:8-9, 11:17-18.  He then withdrew the contention: "As to North Carolina, I will withdraw it."  Tr. 11:22-23.  Asked whether he discusses *McCotter* anywhere in his opening brief, he answered, "I don't know if I did in the opening brief," Tr. 19:1-3, then conceded, "I didn't specifically cite *McCotter*," Tr. 19:16-17 — prompting the Court to flag the omission as a potential waiver, Tr. 19:19-21.  Asked whether the opening brief discusses *International Paper*, he answered, "I don't believe it was cited." Tr. 23:8-10.  Asked to withdraw the "stupid and frivolous" characterization, he did.  Tr. 7:24-8:2; *see* Tr. 8:6-10 (representing that he would withdraw the same language from the reply to the extent it appears there).

The character of these withdrawals deserves comment because counsel's response to the show cause order treats them as mitigation.  But they are not corrective action; they are capitulation.  Counsel in this brief advanced each assertion in the most strident register available and then abandoned each one the moment the Court asked him to produce its foundation, offering no defense because he had none.  His opening explanations were that this Court was reading "the wrong corrected brief," Tr. 6:23, and that the filing was "a draft," Tr. 10:24.  This version of the "dog ate my homework defense" will not hunt.  A lawyer who asserts settled law and then surrenders the assertion — without argument — the instant he is asked for support has not corrected a good-faith error; he instead has confirmed that the assertion should never have been made.  Nor did Mr. Hearne's response to the show cause order improve his case.

### D.    The "No Authority" Representation Was False When Made

One statement in the opening brief warrants separate treatment because it is not merely unsupported; it is false.  Mr. Hearne wrote that the government's position — that the grantors conveyed the railroad fee simple title — "is not only incredulous [sic], it is a frankly stupid and frivolous argument," because "[n]o authority would hold these documents conveyed the railroad title to the fee simple estate in the land."  ECF No. 61 at 23.  Authority had so held, however — twice.  The Supreme Court of North Carolina so held in *McCotter*, on a railroad deed "substantially similar to the language at issue in our case."  Tr. 22:6-10.  And Judge Hadji had so held in *Bevirt* — concluding that "[t]he Source Deeds at issue conveyed a fee simple interest" to the railroad's predecessor, 177 Fed. Cl. at 282.  This is the decision the government filed as supplemental authority, ECF No. 52, in late June 2025, more than a month and "almost ten ECF filings" before counsel filed the brief still "maintaining that there's no such case."  Tr. 7:17-23.  Confronted with the second of these cases at argument, Mr. Hearne conceded the point without qualification:

> THE COURT:  But one authority did so hold, correct?
>
> MR. HEARNE: Yes. . . .
>
> THE COURT: [Your] statement is wrong, isn't it?
>
> MR. HEARNE: That statement would be wrong.

Tr. 6:11-18.  Mr. Hearne likewise conceded that if this Court follows Judge Hadji's interpretation, applies *McCotter*, and applies the statute, "I think I would answer yes"— Plaintiffs lose.  Tr. 5:3-11.

This is where Mr. Hearne's conduct parts company with the careless filer of AI-fabricated citations.  The lawyer who files an AI-hallucinated case at least does not know with certainty that the authority is fake.  Mr. Hearne had the adverse authority delivered to him, on this docket, by the opposing party, more than a month before he signed a brief, declaring that it did not exist — and then repeated that while calling the government's position frivolous.  But a lawyer "must not allow the tribunal to be misled by false statements of law."  Model Rules of Prof'l Conduct r. 3.3 cmt.; *see Hanover*, 146 Fed. Cl. at 450.  Whatever the outer boundaries of that duty, it comfortably reaches an affirmative representation that no contrary authority exists, made while contrary authority sits on the docket under a filing captioned "notice of supplemental authority."  ECF No. 52.

21

The Federal Circuit's Rule 11 case law forecloses any suggestion that such conduct lies beyond the Rule's reach.  If an attorney violates Rule 11 by cropping quotations in a manner that overstates the support for her position, *Precision*, 315 F.3d at 1356, then *a fortiori* an attorney violates it by declaring that *no* authority supports his adversary's position while omitting controlling precedent that supplies it — the very "failing to reference or discuss controlling precedents" the Federal Circuit identified as sanctionable.  *Id.* (quoting *Abbs*, 237 F.3d at 1345).  Nor may counsel "proceed with impunity in real or feigned ignorance of authorities which render his argument meritless." *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1542 (1986); *see Jorgenson*, 846 F.2d at 1351-52.  Whether Mr.  Hearne's ignorance of *McCotter* and *Bevirt* was real or not, the certification he signed was false either way — and zealous advocacy supplies no defense because "a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy." *Cost Control Mktg.*, 64 F.3d at 925.

**E.**      **The North Carolina Authorities Mr. Hearne Now Offers Are Inapposite and Do Not Rescue His Otherwise Frivolous Legal Assertions**

This Court's order to show cause gave Mr. Hearne a second chance: for each unsupported assertion, he had an opportunity to supply the single best North Carolina authority he could now locate, with the precise language relied upon.  ECF No. 69 at 4.  The exercise proved the order's point.  Mr. Hearne's response answered a question this case does not present, and simply fails to support his otherwise orphaned assertions regarding North Carolina law.

**Assertion 1.**  For the proposition that North Carolina "strongly disfavors" fee estates in strips of land and "presumes" such strips to be easements, Mr. Hearne now cites N.C. Gen. Stat. § 1-44.2 and *McDonald's Corp. v. Dwyer*, 432 S.E.2d 165 (N.C. Ct. App. 1993), *aff'd*, 450 S.E.2d 888 (N.C. 1994).  ECF No. 71 at 10-12.  Neither authority addresses, let alone supports, the critical proposition.  Section 1-44.2 is captioned "Presumptive ownership of abandoned railroad easements" and operates only "[w]henever a railroad abandons a railroad *easement*" (emphasis added).  Thus, by its terms, the statute presupposes that the railroad held an easement.  The statute says nothing about how a court decides, in the first instance, whether a conveyance *to* a railroad transferred property in fee simple or merely an easement.  Moreover, the property interest at issue in the *McDonald's* case was an *admitted, already-abandoned* easement, so the court had no occasion to construe a deed as between fee and easement.  *McDonald's*, 450 S.E.2d at 889 ("This case involves the ownership of land formerly subject to a railroad right-of-way

22

easement which was abandoned by Seaboard Coastline Railroad prior to 19 June 1987.").

As for the statutory provision, § 1-44.2, the Supreme Court of North Carolina held only "that the first sentence of subsection (b) of North Carolina General Statute section 1–44.2 is unconstitutional because it does not provide sufficient notice, an opportunity to be heard, and just compensation before divesting owners of a valuable property interest." *McDonald's*, 450 S.E.2d at 892.  Nothing in this case purports to explain *when* an instrument conveys a fee as opposed to an easement or otherwise indicates that N.C. Gen. Stat. § 1-44.2 somehow trumps N.C. Gen. Stat. § 39-1, or is even dealing with the same subject matter.

Mr. Hearne's invocation of the centerline presumption is difficult to follow, and in any event it assumes the answer to the very question before this Court.   The centerline presumption applies only to easements and to "those persons, firms or corporations owning lots or parcels of land adjacent to the abandoned *easement*."  N.C. Gen. Stat. § 1-44.2(a) (emphasis added).  Invoking it here merely begs the question that this Court must decide — and did decide *supra*: did the original railroad's source deeds convey the land at issue in fee or did the railroads possess only an easement?  The centerline presumption cannot answer that question.  If this is the best cite Mr. Hearne can muster, this Court correctly concludes that the relevant assertion in his brief in fact has no basis and is frivolous, particularly in the absence of addressing N.C. Gen. Stat. § 39-1 or *McCotter*.

**Assertion 2.**  For the categorical claim that "the only interest the railroad could acquire was a right-of-way easement," Mr. Hearne offers *Beasley v. Aberdeen & Rockfish R. Co.*, 59 S.E. 60 (N.C. 1907) — the opening brief's lone North Carolina citation under that heading, Pls. Cross-MSJ at 28 n.10 — now together with *Tighe v. Seaboard Air Line R. Co.*, 97 S.E. 164 (N.C. 1918); *Raleigh & Augusta Air-Line R. Co. v. Sturgeon*, 26 S.E. 779 (N.C. 1897); and *Sparrow v. Dixie Leaf Tobacco Co.*, 61 S.E.2d 700 (N.C. 1950).  ECF No. 71 at 12-15.  None of these cases support the proposition that a railroad could acquire only an easement.

*Beasley* — the only case from the opening brief — is the clearest mismatch.  The deed at issue in that case did not convey land; it granted only "a right of way" and easement, and the court said so: "[n]o land is conveyed but a 'right of way' and easement."  59 S.E. at 61.  A holding about a deed that conveys *no land* cannot support a categorical rule about deeds that *do* convey "a strip" of land "forever."  Worse for counsel, the grantee in *Beasley* was not a railroad and could not lawfully build one: it was an

improvement company chartered under a general incorporation law that "expressly excepts from the corporate powers granted building railroads," empowered only to build "tramways or other roads, not meaning railways," and therefore one that "had no power to build or operate a railroad, and therefore no capacity to take and use an easement for that purpose." *Id.* at 61-62. *Beasley* thus construes the grant of an easement in light of the limitations on the grantee's authority. It says nothing about whether a deed granting land to an actual railroad conveys a fee — which is the only question here, and which *McCotter* answers in the government's favor.

*Tighe*, *Sturgeon*, and *Sparrow* miss Mr. Hearne's target for much the same reason: each involves an easement and what is litigated is something other than its existence. *Tighe* is a *width* case — the dispute was whether the railroad's right of way ran one hundred feet or some lesser width; the holding was simply that the railroad "is restricted to the boundary described in its deed." 97 S.E. at 167. The easement-presumption language counsel quotes from *Tighe* is, by its own terms, confined to deeds "for the 'right of way'" or to acquisition "by condemnation or by occupation" — the very modes of acquisition *McCotter* distinguished from a deed of purchase. *Tighe*, 97 S.E. at 166-67; *see McCotter*, 101 S.E.2d at 334-36 (deeming the railroad deed "presumptively a deed of purchase" and distinguishing the condemnation dictum in *Shepard v. Suffolk & C. R. Co.*, 53 S.E. 137 (N.C. 1906)). *Tighe*'s presumption attaches only when a railroad acquires "the right of way" — by condemnation, occupation, or "a deed for the right of way" — not where, as in *McCotter* and here, a deed conveys the underlying land itself. *Id.* at 167 (internal quotations omitted).

In *Sturgeon*, the North Carolina Supreme Court explained that "the right which railroad companies acquire in lands *condemned* for their rights of way amounts to an easement, and not to the purchase of the estate of the owner." 26 S.E. at 780 (emphasis added) (citing *Blue v. Aberdeen & W.E.R. Co.*, 117 N.C. 644, 23 S.E. 275, 275 (1895)). But, in *Sturgeon*, the court recounted, "[t]he plaintiff company, did not acquire its right of way by either condemnation or purchase." *Id.* at 779. Rather, "[i]ts claim to the title and absolute and actual possession of the whole of the 100 feet on both sides of its track is founded upon what it contends is the legal effect of one of the provisions of its charter…." *Id.* at 779-80. Thus, *Sturgeon* cannot tell us anything about the proper interpretation of a putative conveyance.

*Sparrow* concerned the permissible *use* of a right of way the parties stipulated was an easement, not whether an easement existed. 61 S.E.2d at 701-02 ("The lessor railroad

24

acquired its right of way under and by virtue of Sec. 27, Chap. 136, Laws 1852. It thus acquired and possesses nothing more than an easement for railroad purposes, with the right of actual possession of so much thereof as is necessary for the operation of its road and to carry on its business as a common carrier of freight and passengers with dispatch and convenience."). And "[t]he concrete question" before the court was "whether the use of the building in question as a tobacco redrying and storage plant is, under the facts agreed, a misuse of the railroad company's easement in the land occupied by the said buildings." *Id.* at 704. This case is thus similarly entirely inapposite to the central issue presented by the parties' cross-motions for summary judgment in this case.

A deed of purchase is not a condemnation, and the question of the existence of a fee estate is not the same question as its width or its use. On the question these cases do *not* reach, the controlling authority is flatly contrary: *McCotter* held a voluntary railroad deed conveyed "an unqualified fee-simple estate," 101 S.E.2d at 334, and *Craig* reaffirmed that such a deed may indeed "convey[] a fee simple" and not "merely an easement," 138 S.E.2d at 36. Mr. Hearne's assertion that "the only interest the railroad could acquire was a right-of-way easement," a proposition the State's highest court has twice rejected, is not "warranted by existing law." RCFC 11(b)(2). Mr. Hearne provides nothing that remotely undermines the North Carolina Supreme Court's holding in *McCotter* or its application to the undisputed facts of the case before this Court.

**Assertion 3.** For Mr. Hearne's claim that N.C. Gen. Stat. § 39-1 "do[es] not apply to servitudes such as easements," he now refers to the statute's text, a 1968 student note, Mahlow W. DeLoatch, Jr., *Future Interests — The Rule in Shelley's Case*, 4 Wake Forest Intra. L. Rev. 132 (1968), and *Vickers v. Leigh*, 10 S.E. 308 (N.C. 1889). ECF No. 71 at 15-16; *see also* Tr. 51:2-20. In response to the show cause order, Mr. Hearne admits that his opening brief "does not cite a North Carolina case that expressly supports this proposition." ECF No. 71 at 15. The order to show cause further directed counsel to quote the single passage of the DeLoatch article that best supports Mr. Hearne's argument. ECF No. 69 at 4-5. But Mr. Hearne quotes no language from the article — in violation of this Court's order — for the obvious reason that the DeLoatch article is devoted entirely to the Rule in Shelley's Case and to urging its abolition; it neither discusses nor cites any authority on whether § 39-1 reaches a fee-versus-easement dispute. *See* DeLoatch, at 145-48.

*Vickers* is worse for counsel still, because it holds the opposite of what he cites it for. Mr. Hearne cites *Vickers* to posit that N.C. Gen. Stat. § 39-1 governs only "estates" and not "servitudes." But *Vickers* is a decision *applying* a fee-construction principle. As

25

the North Carolina Supreme Court later explained:

> It must be conceded that prior to 1879 the word "heirs" was in certain instances held to be necessary to create a fee–simple estate. However, the decision in *Vickers v. Leigh*, 104 N. C. 248, 10 S. E. 308, declared that the trend of judicial utterances plainly indicated a disposition to relax the rigor of the common–law rule that invariably demanded the presence of the word "heirs" as a necessary requisite for the creation of an estate of inheritance by deed. Seeking to avoid the manifest idolatry of a word, the courts by a process of highly technical reasoning and bold transposition of words undertook to construe conveyances so as to effectuate the hypothetical intention of the grantor without primary regard for technical terms. This liberalizing tendency finally headed up in a statute, now known as C. S. § 991, and enacted in 1879.

*Tucker v. Smith*, 154 S.E. 826, 827 (N.C. 1930). *Vickers* thus applied the canon that "if two constructions can be placed on a deed . . . that shall be given to it which is most beneficial to the grantee," and on that basis — and its other terms — read the instrument at issue to convey a fee. 10 S.E. at 311 (noting that "[t]he liberal tendency of the age in reference to deeds culminated in the act of 1879, (Code, § 1280,) providing the same rule of construction for deeds as for devises" — the predecessor statute to § 39-1).

The bottom line is that Mr. Hearne's response to the show cause order suffers from the same problems the order identified: across two briefs, an oral argument, and a court-ordered response, Mr. Hearne has yet to cite a single North Carolina decision that supports his sweeping assertions. The North Carolina decisions that *do* address the precise question for this Court — *McCotter*, *Craig*, *Crawford*, *International Paper* — were all absent from his opening brief. The reason for the omission seems clear: *McCotter* and *Craig* squarely favor the government, and *Crawford* applied § 39-1 to the very fee-versus-easement question Mr. Hearne insists the statute does not reach. *See Crawford*, 257 S.E.2d at 697 (distinguishing *McCotter* and holding that "[a]s to the application of [G.S. § 39-1], . . . it was plainly intended by the conveyance to convey an estate of less dignity than fee simple").

26

A common defect runs through just about every authority Mr. Hearne has offered, in his briefs and in his response to the show cause order: each presupposes an easement and addresses its consequences — its scope, its width, or who owns the land when it is abandoned. This defect reflects a basic misrepresentation in Plaintiffs' repeated arguments. This case is not about how to interpret the scope of an easement. It is about whether the deeds at issue conveyed an easement at all or instead a fee simple estate in a strip of land. On that (necessarily) antecedent question, the deed language and the controlling North Carolina statute and decisions point the same way: in the government's favor.

Start with what the granting clauses convey. The *McCotter* deed conveyed "a tract or parcel of land 100 feet in width." 101 S.E.2d at 332. The representative deeds conveyed to the railroad "and its successors forever a strip of land of sufficient width upon which to locate, construct, operate, and maintain a standard gauge railroad through said premises." Pls. Cross-MSJ at 23 (Wilson deed); *see* ECF No. 71 at 18 (quoting the materially similar Ledbetter deed). Both convey *land*. And *International Paper* is inapposite, as the deed in that case conveyed no land at all — only "the right and privilege . . . to enter upon" the grantor's tracts and lay out a railroad. 345 S.E.2d at 23. Indeed, *International Paper* contrasted *McCotter*'s grant of "a tract or parcel of land" with a granting clause that "conveyed only the right and privilege to enter upon the lands." *Id.* The line *International Paper* drew is the line that decides this case — but the deeds at issue here fall on the *McCotter* side of it. As this Court put it at argument: "The object of the verb 'convey' here is [']strip of land[']." Tr. 57:21-22.[10]

Plaintiffs' reply brief — the first filing in which Mr. Hearne engaged *McCotter* at all — confirms rather than cures his significant misrepresentations. *See* Pls. Reply at 13. There, Mr. Hearne recast the controlling decision of the state's highest court as an "unusual and exceptional" result to be "cabined . . . to the unique language in the *McCotter* conveyance," and offered *International Paper* as "[t]he better case." *Id.* A lawyer may argue that binding precedent is distinguishable; but she or he may not relegate it to

---

[10] Even the authority Plaintiffs cited at argument cuts against them: the *King Associates* decision distinguishes *International Paper* on the ground that there "what was granted was a right and privilege and no land was conveyed," whereas a deed that says "I convey a strip of land forever" is something else. Tr. 58:19-59:4; *see King Assocs., LLP v. Bechtler Dev. Corp.*, 632 S.E.2d 243, 247–48 (N.C. Ct. App. 2006) (disagreeing with plaintiffs "that the facts of the instant case are sufficiently similar to the facts of *International Paper*," and instead finding "the facts here more comparable to the facts of *McCotter*" due to deed language such as "the part and parcels of said land herein granted").

a reply, after his opening brief declared that no such authority existed. And in any event the distinction fails even considering counsel's considerable spin. The reply concedes that the deed at issue in *International Paper* "predated the enactment of G.S. 39-1," *id.* at 14 (quoting *International Paper*, 345 S.E.2d at 234), which is why N.C. Gen. Stat. § 39-1's fee presumption did not operate in that case. But the deeds at issue in our case were executed in 1894-95, fifteen years *after* the enactment of the first version of N.C. Gen. Stat. § 39-1. The presumption that was absent from *International Paper* thus governs this case, exactly as it governed in *McCotter*.

Other deed features Plaintiffs invoke do not help them, as *McCotter* itself indicates — something counsel conceded just about point-by-point at argument. Right-of-way language? *McCotter* holds it "does not necessarily mean that what is being conveyed is an easement," and counsel conceded the language is "not conclusive." Tr. 23:13-25. A recital limiting the land to railroad use? "Without significance," as counsel agreed. Tr. 24:4-13; *see* Tr. 38:3-5. Nominal consideration (Assertion 4)? The *McCotter* deed recited two dollars; the ones at issue recite a dollar, but Mr. Hearne disclaimed any distinction and agreed "the amount's not going to help you because the Supreme Court of North Carolina has spoken to that." Tr. 20:7-17. Reversionary language? "There is no reversionary language." Tr. 39:13-14. The only durational term — a deadline to construct the railroad — "was satisfied," Tr. 39:24-40:2, and the *McCotter* deed itself contained a defeasance condition yet conveyed a fee, 101 S.E.2d at 332.

Mr. Hearne had no basis in law or fact for his sweeping assertions in his opening brief and the response to this Court's show cause order yields no firmer ground for him.

### F.    Mr. Hearne Violated Rule 11 Under the Objective Standard, and the Record Does Not Support a Good-Faith Explanation

Measured objectively, Mr. Hearne violated his RCFC 11 certification. Counsel presented categorical statements of North Carolina law — "the only interest the railroad could acquire," "No authority would hold," the strip-and-gore "presum[ption]" — on the dispositive question in the case, without any supporting North Carolina authority, and contrary to the controlling decisions of the Supreme Court of North Carolina. No reasonable attorney who had conducted "an inquiry reasonable under the circumstances," RCFC 11(b), into North Carolina railroad-deed law could have missed *McCotter*: the Government's own motion featured it, Tr. 19:11-13, and the most cursory search for North Carolina authority on railroad conveyances returns it. And no attorney

who had read the docket could have certified that "[n]o authority would hold" what Judge Hadji had held in a decision filed on that docket as supplemental authority. The contentions were *not* objectively reasonable when filed. *Kilopass*, 738 F.3d at 1313.

Mr. Hearne's response to the show cause order answers none of these glaring omissions and falsities. He offers a closing assurance that his representations were made "in complete good faith and without any intention whatsoever to mislead the Court." ECF No. 71 at 25. As a legal matter, the assurance is beside the point: subjective good faith is not a defense, *Kilopass*, 738 F.3d at 1313; *Chambers*, 501 U.S. at 47, and the objective standard exists precisely to "eliminate any 'empty-head pure-heart' justification," Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. As a factual matter, moreover, the assurance is utterly unexplained — and on this record, inexplicable. Nowhere does Mr. Hearne account for how his brief asserting settled North Carolina law came to cite no supporting North Carolina authority; for why *McCotter* went unmentioned while the brief declared that no authority supported the government; or for why Judge Hadji's decision, served on counsel more than a month before he filed his opening brief, was never acknowledged. The only explanations counsel has ever offered were that the Court was reading "the wrong *corrected* brief" and that the filing "was a draft" — explanations that are no defense. Tr. 6:23-7:3, 10:24-25 (emphasis added). Mr. Hearne never even asked for leave or otherwise attempted to file a *corrected* "corrected brief." Ultimately, this is not "the dog ate my homework defense"; this is a new one this Court has never heard: "the dog ate my real brief and then I filed the wrong one."

Let's be clear. There are only two ways to assert, with confidence and invective, that the law of a state is settled in one's favor while citing none of it: either counsel never performed the inquiry Rule 11 requires, or he performed it and represented the law to be other than what he found. The first is a textbook violation of RCFC 11(b)(2). The second is worse. This Court need not choose between them because the standard is objective. But the pattern this record discloses, taken whole, is fairly read as an effort to steer the Court away from the law that governs this case, while vilifying the party who had correctly explained it.[11]

---

[11] Although we do not rely on any prior conduct in imposing sanctions, the undersigned is not the first judge of this Court to criticize Mr. Hearne for unsupported arguments. *See Barron v. United States*, 174 Fed. Cl. 114, 128 (2024) (Meyers, J.) ("Vermont law is not Florida law— Montpelier does not govern Miami. Plaintiffs have pointed to nothing that supports their assertion that '[t]he principles of Vermont law in the early 1900s ... are indistinguishable from Florida law in the early 1900s.'" (quoting Mr. Hearne's brief)).

* * * *

Other members of the bench and bar may think this opinion harsh. But extending grace to the conduct this Court critiques and sanctions today would be accompanied by a significant externality — a cost imposed on others: unsophisticated clients who think they are getting zealous advocacy when in reality they have no case, or their arguments are poorly constructed. The only way for this Court to protect future litigants — if not our adversarial system as a whole — is to take the time and effort to enforce Rule 11. This Court of course takes no issue with novel or creative arguments or with counsel who flag adverse precedent and attempt to distinguish it, even where difficult to do so. But this opinion should serve as a warning to litigators in future cases before this Court: we will not tolerate briefs that entirely lack support for asserted propositions or that contain blatant misrepresentations of case law — whether wholly invented by machine or substantially by man.

## III. CONCLUSION

For the foregoing reasons, the government's Motion for Summary Judgment, ECF No. 51, is **GRANTED**, and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 61, is **DENIED**. The Clerk of Court is directed to enter judgment accordingly.

Furthermore, pursuant to RCFC 11 and this Court's inherent authority, Mr. Hearne must compensate the government for its time and costs expended on responding to Plaintiffs' cross-motion for summary judgment, as well as for the time government counsel spent preparing and presenting oral argument. In that regard, Mr. Hearne shall meet and confer with the government counsel to discuss the government's claimed costs and, on or before **July 31, 2026**, the parties shall file a joint status report indicating whether the parties have reached an agreement on the sum to be paid the government or, alternatively, presenting their respective positions. This Court urges the parties to be reasonable in their discussions — and, if necessary, in presenting their respective positions in the joint status report — because in the event of disagreement this Court will select the more reasonable of the two positions.

Finally, Mr. Hearne is ordered to pay the Clerk of this Court $5,000, representing a *very* modest penalty for wasting judicial resources — well below the value of the time this Court expended researching nonexistent North Carolina law.  This sum is in line with what other courts have imposed for similar Rule 11 violations, as catalogued *supra*.

These sanctions shall be borne by Mr. Hearne, without recourse to his clients; and a copy of this opinion and order shall be provided to all of the Plaintiffs.  Mr. Hearne shall certify that he has done so in the parties' next joint status report.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Chief Judge

31